Good morning, Your Honors. May it please the Court and Counsel, my name is David Slade. I'm here for Plaintiff Appellant Kristanalea Dyroff. I'd like to save five minutes of my time for rebuttal, if I may, please. All right. Counsel, before you begin, regardless of the outcome of this case, please accept our condolences on behalf of your client. This is a tragic situation, and we really keep that in mind. Your Honor, thank you very much for your sensitivity. I know that these are very difficult cases, and they arise in moments where, regardless of the equities, the law might compel a complicated outcome, and we're very grateful for your sympathy. Thank you. Your Honors, the District Court committed two critical errors. The first was a failure to apply this Court's binding authority and recognize that when a website materially manipulates third-party content, that new, separate, derived content is not shielded by Section 230 of the Communications Decency Act Savings Clause. Instead, a website has transitioned in this context from being an interactive computer service and has now become, at least vis-à-vis this new content, an information content provider. And claims related to that new content do not seek to treat the website as a publisher, but rather seeks to treat the website as an independent content creator. What do you claim was manipulation? Your Honor, the critical manipulation here was the act of identifying data about the individuals, both in this instance, Wesley Greer, the heroin addict, and then Hugo Marginot-Castro, the heroin dealer, separate and apart from the data that they provided to the website. The complaint describes that there were artificial intelligence and deep learning techniques that were coded into the website, the purpose of which was to derive unique inferences about the individuals and then to sort of guide them through the website and push them towards new content. In the case of Wesley Greer, and in his specific circumstance, to guide him to more content that the website believed would be enticing to him as a heroin addict. For Hugo Marginot-Castro, it would be to guide him towards content that was more relevant to him as a heroin dealer. And this is not bald assertion or defamation. This is supported in the complaint and in the underlying allegations. This particular website created a data corpus that it used to fuel. Counsel, you're really above my pay scale. I'm sorry, Your Honor. Dealing with the abstractions of the internet and software. I'm an old trial attorney. Give me the facts. What did this service do besides publish the names? It took content on its website and it tried to steer individuals to that other content. How? Sure. That's an abstraction. That's a conclusion. Understood. Tell me what they did. Well, and I would submit it is not a conclusion because they admit to doing this and we cite to their representations about it. But there was a great illustration of this that is not an abstraction. It is very concrete. It was in this morning's New York Times. It relates to a website called YouTube. And YouTube is a place where people post their own videos. Now, the article was about parents who were shocked because they posted videos about their children. Now, we can agree that that third party content is solely related to their kids. You know, if I take a video of my son doing something cute and I put it up to YouTube, that is my purpose. But what YouTube had done was it analyzed the fact that there were children in these videos and slowly started categorizing this corpus of videos and was recommending them to users that it had identified as pedophiles. So it had separately taken that content and offered it up to its pedophile viewers and presented it to them saying, hey, here's something that we think you'll like. But is that what happened in this case? Didn't in this case the website allow people to self-identify as to what groups they wanted to communicate with? And once they self-identified themselves, I love dogs, I have cancer, I'm a heroin addict, then other people who had that same interest were allowed to link together on those, on the site. Well, certainly the self-identification was one data point, absolutely. But there were other data points that were created in the profiles that were not signals that the individual gave. What were the data points other than the signals that were given by the person joining the group? What data points in addition to those are you saying made the website a content provider? That added to the data profiles that it would create of the individuals? No, I mean, what binding case are you saying that we should look to to determine culpability or ineligibility for immunity in this case? What case are you talking about? I think that one of the clearest, I mean, all of the authorities in the brief, I believe, stand for this proposition. But I think that one of the best illustrations of this is the content, or the source of my 20HA letter from yesterday. HomeAway.com is a great illustration because there what happened was a website by ordinance was prohibited from brokering a connection or a transaction between two entities. And its job was to match a renter with a rental property, you know, along with the website. Along the lines of Airbnb, and the city of Santa Monica said you can't do that unless these are licensed brokers. The website said this is all third-party content. There's nothing that you're doing other than penalizing us for connecting two people whose interests are, you know, created through their own self-identified inputs. And this court said, no, that's not true. What we're prohibiting is you identifying these people and putting them together in this transaction. Citing to BeckmanVMatch.com, the court held this doesn't penalize somebody for publishing third-party content. Rather, it prohibits a certain activity that if somebody declines to do, doesn't in any way, shape, or form require the website to purge or edit that third-party content. And this is a case where the defendant is not trying to put the website together. And the court says, no, this doesn't penalize anybody for that. Mr. Slade, would you get back to my question? Yes, Your Honor. What did this defendant do that was different? That is nonconclusory. Certainly. The defendant is alleged in your complaint. Indeed, indeed. Your Honors, the defendant would identify the meaning and the emotional intent behind each of the posts. And that was something that would draw inferences from that. And it admits to doing it. And it sold this functionality in its enterprise software. It would basically draw its own inferences about the users via these other signals. Now, that's not an input. The inference that the website draws is not an input that the person provides. Rather, they write something. The defendant then applies an algorithm to it, draws its own conclusions of what that means and what the emotional intent is. And then does what? And then uses it to try and steer the individuals to the different groups. So the purpose of divining, of profiling the individual is to keep them engaged on the website, to push them towards other content on the website. In other words, to me, it's kind of if you were outside the Internet world, it would be like introducing one person to another person. I think you like sports. She likes sports. So the two of you may have something in common. How is that content? How is that developing content? Well, Your Honor, I guess the other way to look at it is how is that publishing? It is an act that is separate and apart. And it is a functionality that we're saying is what gives rise to the claim. So the real question is how is this even contemplated in the CDA in the first place? If the website is penalized for doing that, for brokering the sale of heroin in this context, and say as a function of that they were forced to never do that brokering again, they could stop. They could be found liable and move forward in compliance with the law and never touch, never edit, never purge a single third-party post again. They would simply be prohibited from brokering. I concede that there is no liability that this website can face for allowing a third-party post to be posted that brazenly traffics heroin or fentanyl or opiates or anything else. That is completely preempted by Section 230 of the CDA. But what is not preempted by Section 230 of the CDA is the subsequent behavior of the website to identify users and to put them together. And how do they identify users and steer one to another? Please give me your thoughts on that. Well, Your Honor, absolutely. So what they did was, and this is on paragraph 23 of the complaint, excerpt of the record, page 40. And this is after, I guess, also excerpt of the record 39, paragraph 22. The technology I'm reading in the middle of paragraph 22, the technology behind the data mining, which data mining is a concept where you take somebody else's data, you examine it in myriad ways and you draw inferences from it that are your own, was concurrently developed and used by Kanjoya, the data company that was also started and run by the CEO of this. Upon information and belief, Kanjoya analyzed users' behavior on experienced projects and then sold these data sets to interested parties for various purposes. Now, it then goes on to explain on page 40 of the record that they used a proprietary machine learning predictive model developed by the company Kanjoya, which scores texts in terms of the degree to which it expresses each of a large number of different emotions. Let me ask you this. Yes, Your Honor. Did you ever allege that Castro was called up by the service and said, go sell drugs to Greer? Your Honor, yes, we believe, I do believe. Tell me how he did that. We don't know, Your Honor. But we certainly know that Greer joined the website, Greer began posting, Greer began getting pushed to other content. How was he pushed? Is there any allegation that this website said, Mr. Greer, there is a man named Castro who wants to sell you drugs? There are multiple allegations related to Greer having the content pushed to him. And from there, from there we, drawing all inferences. How was the content pushed to him, like an e-mail saying, hey, Greer, this is Castro over here, wants to sell it to you? We believe that there were e-mails. Now, Your Honor, it is complicated because we have a dead client and we're having to go back in time, and the record is incomplete. But looking at the e-mails that we have seen from the website to Greer, which are exhibits in the complaint, and then looking at the screenshots that we have put in the complaint and that are in the brief, I think the best one for Your Honor's consideration is on page 16 of appellant's reply brief. Page 15? 16, excuse me, Your Honor. Where is it in the record? It is page 16 of the reply brief, docket entry 33, page 22 of 36. But is that page 22 of the record? I'm sorry. Oh, no, no, in the record it's in the complaint, excuse me, Your Honor. But what's the source document for the e-mail, that we can look at the e-mail ourselves? The source document, now, the source document should be, let's see, there is, we have one e-mail. It's excerpt of the record 85, and it's going to be from the complaint. But, Your Honor, I would like to distinguish between the e-mails, which happened off of the website, and then the additional recommendations functionality, which happened on the website. So Judge Beyer's question to you was, how did the website push Mr. Greer into the drug dealer's domain? How did the website do that, rather than Mr. Greer looking at some information on the website, deciding I want to connect with this drug dealer? So that's his question. What in the e-mails pushed Mr. Greer toward the drug dealer? Well, Your Honor, I want to, again, make clear that it's not just the e-mails. It's being on the website. If you load up the website, it will say go here. What on the website pushed Mr. Greer towards the drug dealer? So what we have identified, based on, you know, going back in time and reverse engineering a website that is now shuttered and that you can't use as much as you could, is both the representations of the website saying once we receive data about you, we're going to start pushing other groups to you and recommending them to you. We, you know, and I try and illustrate that. And you have a choice as to whether or not you want to take the association further. So Mr. Greer had the choice as to whether or not to contact the dog lovers, the heroin dealers, the flower lovers. And so all of this, here are some things that you might appreciate based on your input to the website. Respectfully, Your Honor, regardless, his choice has nothing to do with whether or not they've created the content. You know, if experience party drafted the post that said I'm selling heroin, Mr. Greer would have the choice, but the CDA would still obviously not preclude that. Look at roommates.com, and I'm trying to put this in the same framework as roommate.com. The reason that there was not immunity, complete immunity in that case was because the website directed the responses to the website. We don't have that here where the website directed the responses and actually solicited input, targeted input. So that's why I'm saying I'm at a loss as to how the website pushed Mr. Greer to the drug dealer. What is the evidence, not based on non-conclusory facts, shows conspiracy on the part of ultimate software?  Your Honor, I see I've done a pitiful job of marshaling my time. May I answer this question? We helped you a little. Thank you. Your Honor, all inferences and plausible allegations drawn in my favor, the inference or the non-conclusory allegation that the website was shuttered when it had actual knowledge that drug trafficking was occurring on the website, when it had actual knowledge that law enforcement was actively targeting the website's users, and when it elected rather than complying with this, complying with law enforcement requests, it would prefer to shutter the website. Drawing all inferences in my favor, we move forward on the assumption that at least in part the anonymity was meant to be the sole activity. All right. Thank you, counsel. We'll give you a couple minutes for rebuttal. Thank you, Your Honors. Good morning, and may it please the Court. Jeffrey Miller, Lewis, Brisbois, Biscard, and Smith on behalf of Defendant and Appley, the Ultimate Software Group, Incorporated. I'd like to start with the comments I heard about some of the technicalities here and just get down to something with common language for you, what this case is about. What's the big picture? This is a classic situation where we have Section 230 immunity. I have, I will say just like Your Honor did this morning, this is horrific, and I readily admit these facts are horrible. The decedent died after obtaining fentanyl-laced heroin from a drug dealer that was also on the site that he was using, on this site called the Experience Project, where people would post their experiences on this medium. But defendants did not sell this fentanyl-laced heroin. What plaintiff is, when it comes down to it, when we get to the gist of it, what plaintiff is really arguing is that the defendant should not have allowed this particular individual to be part of the system or their posting. But when you think about that, the main problem with that allegation is that is quintessential publishing. Publishing activity includes the decision not only what to put on the site, but what to exclude from the site. So what we have here is a situation where on its face we have a publishing scenario. Roommates, this Court's case in Roommates, also in Barnes, says that whenever an activity that's being alleged can be boiled down, and that's the wording used, boiled down to a decision whether to allow or exclude material from a third party who wants to post it, we have application of the immunity under Section 230. But as I understand, Mr. Slade, he says, and I'm sorry, I haven't quite grasped how, that somehow Castro the seller was steered towards Gere Greer the buyer. Now, that's by use of a term that I think is very elegant but incomprehensible to me, which is called an algorithm. Right? Now, deal with that. Do you deny that there's something about the algorithm and the composition of your website that steers Greer to Castro and Castro to Gere? Your Honor, if I want to just back up a little bit so I give a little context for my answer, this experience project is a social network. It's designed for people to submit their experiences, and then it's up to the individual to make contact or join a particular group. They can post, they can ask questions. Does this experience project sort of classify people because of their experiences into what they would be interested in? Yes. I'm not going to deny that. But it's not a manipulation. All it does is provide information about who may be interested in whatever you're posting. So the information is through the algorithm. It's a situation to develop recommendations that can be forwarded to users, but it's explicitly at the control of the user, and that's the important part. The key here, and I think it was mentioned earlier, is we look at what the main cases are in this case, and Roommates really does set the standard. Why is Roommates even relevant? Experience project did not require users, as you said, to input any information. That was totally voluntary. Is that correct? That is correct. Okay. That is correct. And all I point out Roommates is to say is that that is an absolute carved out exception, and it does not apply that often. It's only in the situation where you have a particular service provider who is creating or developing the content itself that is unlawful. And that's a very, very narrow situation. There was a very, very strong dissent in that case that thought that was even much too of a standard. Because this is a very, very important immunity that we're dealing with. We're dealing with an immunity where Congress has spoken very, very clearly. They want to encourage the use and the development of the Internet. The last thing you want to do is put a chilling effect. So what we have here is a situation with Roommates where they took specific action requiring users to create a particular profile and then answer their questions. They had to do with sex, sexual orientation, et cetera, that was alleged by the plaintiff to be violation of the Federal Housing Act. The conduct itself, they created the conduct by actually making the content. The content by actually making the questions, putting what the responses should be, and that was determined what was unlawful. Here we have a situation where there's no action whatsoever relative to what's being posted. It's completely at the behest of the users of the project. And these algorithms that we're talking about, they're used to incorporate, to allow people to make choices. To see whether they want to join the group or not. But the key is, and this is cases, the Gonzalez versus Google case, the Cohen case that we cited in our briefs, these are what are called neutral tools. In other words, it's the same tools used for whatever group is involved. Your Honor had mentioned, you know, there's a group, I Love Dogs, or a group, I Have Underwent Chemotherapy. The same algorithms for those groups are the same ones used here. It's content neutral. So it is not in any way a situation where they are taking affirmative steps in order to create a, you know, getting these people involved. It is a situation where the plaintiff can allege facts that ultimate software knew drug dealers were using an experience project to facilitate drug use. Your Honor, does that change the duty of care analysis? Your Honor, it does not. And because there are actually cases, Doe versus international brands and other cases, that that is not the key determination. The key determination is when you're a publisher, which we have, that's what the situation is here, the only exception where that immunity is not going to apply is what roommates described. And that's what has to be met, where you are a content creator as opposed to a publisher. So whether you knew or not, that's not the relevant inquiry. In fact, the mere fact that there's criminal conduct after the fact that is voluntarily entered into between the parties that are the users, that's not going to do it. But aren't you creating content when you steer a buyer to a seller? No, Your Honor. Steering is part of this website, which is an interactive thing, but what it is, is a board. This is a bulletin board allowing people to make comments relative to it. But the steering, and that's a conclusion, obviously, but these algorithms are designed simply to provide those individual users a choice. Here are the experiences that I think are interesting. If you want to be involved in that and know something about it, you have the right to post and respond. The algorithms do nothing to affect content whatsoever. There's no manipulation or anything relating to content. In fact, one of the things I noticed when you look at the roommates decision itself is it says when the court looks to determine whether there's technical development or not, there is even merely odds and ends to it. Demanding is not enough. In other words, you can add to things, you just can't provide any material contribution to the unlawfulness. And so this is a situation where the immunity is extremely strong. This reminds me of when I was in college, before the days of Internet, they would have a big bulletin board in the dorm, and they would have cheerleading, hiking, whatever things you're interested in, you put your name on the list, physically put your name on the list. If you're interested in this, other people would put their names on the list, and then you would have a time to meet and talk about whatever it is you wanted to talk about. To me, this is the equivalent of that, but magnified by the Internet. But it is exactly the same thing. See, the key is it's not manipulation by the provider. It's the choice of the user. And that's the real key here, what we're dealing with. Very quickly, to conclude, I did want to mention there was some mention about the collusion issue, so-called collusion issue. That is a classic legal conclusion that we have here. And the only thing that I saw in the record that was even supporting this generality was a letter written in March of 2016 from the defendant to the users. It was an announcement they were going to suspend the website because of concerns for Internet privacy. And the judge below looked at this very carefully and just felt, looking at this, there was an interest in privacy. In fact, their model really requires privacy because they wanted anonymity. But there's nothing in it, she said, to support the fact that there was some type of collusion or trying to prevent the drug dealers from, you know, being looked at by the law. The letter- Why was the website shuttered as opposing counsel characterized it? I can only go by what the contents of the letter says. And as I mentioned, one of the things that this particular website was very, very concerned with was anonymity. The idea there was to share experiences, to post these items on there, it enhanced it by being anonymous because people could be more free. And so that was a very important thing to this particular website. Don't your algorithms have the effect of alerting a buyer to a seller, to the existence of a seller? What it does, Your Honor, is allow someone to know that someone is interested in what you posted. Right. But we don't know what the- Your algorithm, if they were just posting and you didn't have the algorithms, they might not ever come across each other. Your algorithm puts them together. Somebody mentioned it introduces, and then it's at the behest of the individuals to decide whether they want to- Or they take the relationship. That's right. But for your sort of dating service, they wouldn't have met each other. Maybe, maybe not. In fact, one of the interesting parts of what the owner was talking about, the website owner, is that it was a mechanism to try to have- It caught my eye. The letter said, you know, it's a good thing. It prevents people from being lonely. That was what the quote was from the letter. Finally, Your Honor, just a very quick- There was a reference to the HomeAway case, and I just wanted to say that I don't think that has any real relevance here. That was in a very unusual scenario, because they used the immunity as a sword. The plaintiff was the website provider in that case. And we're trying to get around city ordinances by the city of Santa Monica. It had to do with ordinances relating to short-term rentals, and they said that, well, this statute preempted the ordinances. And that certainly could not make sense, because if that were true, then every provider out there would never be able to be subject to local regulations. That's just not right. So the court had an easy time with that, I think, saying that there was no ordinance, no mandate to refer the content. It was only a situation where we were dealing with licenses. So with that, I would highly recommend that the court affirm the dismissal entered by the judge in this case. Thank you, counsel. Two minutes for rebuttal. Thank you, Your Honors. Thank you, counsel. Your Honor, going back to the bulletin board analogy, I think it's distinguishable in this instance, because imagine if you were in college and you saw a bulletin board that was entirely different than what your roommate saw and entirely different from what, you know, your respective friend saw. If all of a sudden something actionable happened in that discrimination, it would be on the college. That's fair. And so that's the distinction that I would like to make, and that's the critical distinction that I'm trying to make here in this instance. Also, my esteemed colleague said that these were neutral tools, all of which that were at the control of the user. I submit that that could not be further from the truth. In the steering of the two people, neither Margaret Nod Castro nor Wesley Greer had any control over being matched by the website. Going to Your Honor's question about the but-for causation, you know, the hypothetical but-for the website, would they have met each other? Well, my colleague says maybe, maybe not. That sounds like a summary judgment question. We should resolve that. We should figure out, because if maybe, then this is actionable. Maybe not, well, then that goes to liability, but at the same time that content has fused the two people. And I guess the last thing I would say is that, again, these are choices that are provided by the website. But providing a choice is a discriminatory act. It is an editorial decision that is made by the website. But isn't that a publishing function as opposed to a content-creating function? No, Your Honor. In this instance, because you are creating the content, the choices, you are saying this guy doesn't like cats, this guy doesn't have cancer, this guy didn't go to Stanford, this guy needs heroin. That at that point is, we've moved from the realm of traditional publishing. Counsel, may I ask you, if you had to choose one case, and that one case you think would be dispositive toward our ruling in your favor, what would that one case be? I would say that the best application of this Court's precedent generally. Not generally. To this case. Excuse me, Your Honor. It would be JS Village Voice Media Holdings with a close second of Anthony Villajue, the district court case.
judges: D.W. Nelson, Rawlinson, Bea